

FILED

8/30/2022

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **Jennifer L. Parson**, individually and as Administrator of the Estate of **Michael Bradley Parson**, deceased, **Brandon C. Rondon**, an individual, and **Catherine C. Hymel**, an individual,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>**Allstate Insurance Company**,<br><br>*Defendant.* | **Civil Case No.** 22-cv-3962 |

## <u>VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES</u>

Plaintiff Jennifer L. Parson, on behalf of herself and the Estate of Michael Bradley

Parson, Plaintiff Brandon C. Rondon, and Plaintiff Catherine C. Hymel (collectively,

"**Plaintiffs**") complain as follows:

## Introduction

1. This is a civil action for monetary damages based on breach of contract and negligent

infliction of emotional distress.

2. This action involves Defendant Allstate Insurance Company's breach of the Allstate

R3001 Exclusive Agency Agreement and its integrated documents against the Estate of Michael

Bradley Parson, Brandon C. Rondon, and Catherine C. Hymel. This action also involves Allstate

Insurance Company's negligent treatment of Jennifer L. Parson following the passing of her

husband, decedent Michael Bradley Parson.

/ / /

**Verified First Amended Complaint**          1

## Jurisdiction and Venue

3. This action arises under the common law of the State of Illinois to redress contractual rights. Illinois law applies here because the contract in question has no choice of law provision and Defendant Allstate has its corporate headquarters and principal place of business in the State of Illinois. The action brought on behalf of the Estate of Michael Bradley Parson arises under Illinois statute regarding survivor claims.

4. This Court has original subject matter jurisdiction under 28 U.S.C. § 1332(a) because the matter is between citizens of different States and the matter in controversy exceeds $75,000.

5. This Court has the authority to provide monetary damages under applicable Illinois law.

6. This Court has personal jurisdiction over Defendant because it is a corporation domiciled in the State of Illinois or it has otherwise made and established contacts within the State to permit the exercise of personal jurisdiction over it.

7. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Defendant resides in this district and is subject to this Court's personal jurisdiction under 28 U.S.C. § 1391(c)(1). Further, Defendant resides in Cook County, so venue is proper in this division of this district.

## Parties

8. Plaintiff Jennifer L. Parson ("**Mrs. Parson**") is the widow of decedent Michael Bradley Parson ("**Brad Parson**" or "**Mr. Parson**"). Mr. Parson was an Allstate Insurance Company Exclusive Agency Owner ("**EA(s)**") who owned one Allstate Insurance Company agency in the State of North Carolina. Mr. Parson passed away in July of 2020 and upon his passing, Allstate Insurance Company refused to recognize his wife Mrs. Parson as the authorized legal

**Verified First Amended Complaint**          2

representative of the agency. This failure prevented Mrs. Parson from timely selling the agency and realizing the full worth of the agency. Mrs. Parson brings Count I to this action as Administrator of Michael Bradley Parson's Estate and Count IV to this action individually.

9. Plaintiff Brandon C. Rondon ("**Mr. Rondon**") was an EA who owned one Allstate Insurance Company agency in the State of Oklahoma. Although Mr. Rondon consistently met and exceeded all sales expectations, Allstate Insurance Company terminated the contract for Mr. Rondon's agency on or about March 5, 2021, and subsequently interfered in Mr. Rondon's attempts to sell the agency. Mr. Rondon brings Counts II and III to this action.

10. Plaintiff Catherine C. Hymel ("**Ms. Hymel**") was an EA who owned one Allstate agency in the State of Louisiana. Although Ms. Hymel consistently met and exceeded all sales expectations, Allstate terminated the contract for Ms. Hymel's agency on or about February 28, 2021, and subsequently interfered in Ms. Hymel's attempts to sell the agency. . Ms. Hymel brings Count V to this action.

11. Defendant Allstate Insurance Company ("**Allstate**") is incorporated in the State of Illinois and maintains its principal place of business in Northbrook, Illinois, which is in Cook County, Illinois. Allstate is a resident of the State of Illinois pursuant to 28 U.S.C. § 1391(c)(1). district.

## Procedural History

12. On July 29, 2022, Plaintiffs Mrs. Parson and Mr. Rondon filed the Verified Complaint in this action. Doc. No. 1. On August 9, 2022, Counsel for Plaintiffs served the Verified Complaint on Counsel for Defendant Allstate via U.S. mail.

**Verified First Amended Complaint**          3

13. Since the initial filing and service of the Verified Complaint, Counsel for Plaintiffs learned of Plaintiff Ms. Hymel's claims against Defendant Allstate.

14. Plaintiffs hereby file the instant First Amended Complaint pursuant to Rule 15 of the Federal Rules of Civil Procedure allowing for amendment as a matter of course. Fed. R. Civ. P. 15(a)(1).

## Facts

### I. EA Agreement Generally

15. Allstate EAs are independent contractors of Defendant Allstate who are authorized to sell insurance policies on behalf of Allstate in exchange for commission and building a valuable book of business. EAs are not permitted to sell insurance policies from other insurance companies.[1] EA Agreement, Section I.E.

16. In order to become an EA with Allstate, all prospective EAs must enter into the R3001 (S or C) Exclusive Agency Agreement and accompanying integrated documents (collectively, "**EA Agreement**") with Allstate.[2] These integrated documents include the Exclusive Agency Independent Contractor Manual ("**Manual**"), the Supplement for the R3001 Agreement ("**Supplement**"), and Exclusive Agency Independent Contractor Reference Guide ("**Guide**"). Copies of the EA Agreement and integrated documents are attached to this complaint

---

[1] In some limited circumstances, and with Allstate's prior written approval, an EA may sell a policy underwritten by another company, cooperative industry, or government established residual market plan or facility. EA Agreement, Section I.E.

[2] The C version of the R3001 Agreement has been developed as an option for R3001 Agents who form corporations or limited liability companies. The S version is for Agents who operate as sole proprietorships.

as Exhibits 1-4.[3] The executed EA Agreement between Allstate and an EA forms a valid contract under the laws of the State of Illinois.

17. When an EA sells an Allstate insurance policy, the value of that policy becomes part of the EAs "book of business."

18. The express terms of the EA Agreement establish that Exclusive Agents have an economic interest in the book of business created by the Independent Contractor relationship with Allstate, based on the EA Agreement. *See Manual,* pg 38.

19. The express contract terms specify that each EA's economic interest in the book of business includes the right for EAs to sell their economic interest to an approved buyer, or to receive a termination payment from Allstate, if vested. *Id.*

20. The right to sell the economic interest in the book of business is one of the most significant benefits to the EA.

21. Often, an existing EA will be the potential purchaser of a book of business, and the EA Agreement specifically contemplates this type of transaction. The Manual states that, "A qualified R3001 Agent may be approved as a buyer of your interest in the book of business serviced by your agency." *Id.* at 39.

22. The Manual also states that "[i]n order to be considered for a book purchase, the agent must meet the then current qualifications established by [Allstate]." While sales of a book of

---

[3]Pursuant to a confidentiality clause within the integrated documents and out of an abundance of caution, Plaintiffs filed a *Motion for Leave to File Documents Under Seal* for Exhibits 1-4 to the Verified Complaint. *See* Doc. No. 4. Plaintiffs subsequently filed *Exhibits to the Complaint Under Seal*, which Plaintiffs cite to now. *See* Doc. No. 12.

**Verified First Amended Complaint**       5

business are subject to Allstate's approval based on whether the buyer[4] is qualified, Allstate sets out objective criteria to evaluate whether a existing EA buyer is qualified. *See id.* at 39-40.

23. This list of objective qualifications gives EAs a reasonable expectation under the EA Agreement that Allstate will at least consider a potential buyer of the selling EA's book of business if that existing buyer meets the objective qualifications.

24. Upon information and belief, Plaintiffs were unable to sell their books of business for market value because Allstate has interfered with potential sales and induced potential buyers to purchase other books.

25. As a result of Allstate's interference in potential sales, Plaintiffs have been forced to sell their book for far less than market value, or receive a termination payment from Allstate for far less than the full value of their economic interest.

## II.    Allstate's Interference in Agency Sales Contrary to EA Agreement

26. The EA Agreement makes clear that agents have the option to sell their economic interest to an approved buyer, or to receive a termination payment.

> Subject to the terms and conditions set forth in the R3001 Agreement, the Supplement, and this Manual, you may transfer your economic interest in the business written under the R3000 and/or R3001 Agreement upon the termination of your agency relationship with Allstate by either:
>
> 1. Selling your economic interest in the business to an approved buyer
>
> 2. Electing the termination payment.

*EA Independent Contractor Manual,* pg 38.

27. Upon termination of the EA agreement, an EA has 90 days to find an Allstate-

---

[4]Allstate lists separate objective qualifying criteria depending on whether the prospective buyer is an existing Allstate Agent, or an outside buyer.

**Verified First Amended Complaint**          6

approved buyer for their economic interest, reach an agreement with that buyer, and close the

sale with that buyer. *See id.* at 32-38. If the agent does not sell his or her economic interest within

that 90-day window, he or she will receive the termination payment ("**TPP**"), which is generally

less than 50% of the sale value of the economic interest.

28. The EA Agreement also states multiple times that Allstate is allowed broad discretion

in approving or denying sales.

> The Company shall have the right to approve or disapprove the sale of the
> economic interest in the book at any time up until the time the transfer of the
> economic interest has occurred.

*Id.* at 39.

29. The EA Agreement emphasizes that Allstate is to have no involvement in an agency

sale, except to approve or deny the sale.

> In sale of agency situations, Allstate is never the buyer or seller. The only times
> Allstate is involved is to approve the buyer and when you elect to receive the
> termination payment. If you elect to sell, you do not receive the termination
> payment from Allstate. It is your responsibility to establish a value and negotiate
> the sale price for your economic interest in any of the business included in the
> transfer.

*Id.* at 41.

> **A.    Allstate's Interference in the Sale of Decedent Agent Michael Bradley
>          Parson's Agency**
>
>> **1.    Mrs. Parson meets with Allstate representatives following Mr.
>>          Parson's fatal diagnosis.**

30. On or about September 14, 2014, Mrs. Parson's husband decedent Brad Parson

purchased an Allstate agency in the State of North Carolina. Mr. Parson chose Allstate because

of Allstate's unique incentive structure which would allow Mr. Parson to sell his book for market

**Verified First Amended Complaint**          7

value upon retirement. Mr. Parson founded the agency as an S-Corporation.

31. On or about September 21, 2019, Mr. Parson was tragically diagnosed with a fatal health condition (one symptom of which was compromised cognitive reasoning) and given thirty days to live.

32. On or about October of 2019, Mrs. Parson met with Mr. Parson's Allstate Field Sales Leader ("**FSL**") Erin Means ("**FSL Means**") to alert her of Mr. Parson's current and grave circumstance and to determine any steps Mrs. Parson should take to preserve Mr. Parson and his estate's interest in the agency. FSL Means advised Mrs. Parson to keep the agency open after Mr. Parson's passing because it would be easier to sell the agency if it was still operating. Mr. Parson then hired an employee with the necessary credentialing and licensing to keep the agency open and facilitate ease of sale for Mrs. Parson.

33. Neither FSL Means nor any other Allstate representative ever informed Mrs. Parson at the October 2019 meeting or at any other time of any additional documentation that required execution of a document specifying Mrs. Parson as the agency's legal representative upon Mr. Parson's passing. Mrs. Parson had previously executed legal documentation naming her Mr. Parson's legal representative which authorized her to act on behalf of the agency.

34. On or about July 31, 2020, Mr. Parson tragically passed away, leaving Mrs. Parson a widow responsible for raising their two young daughters, aged ten and twelve years old at the time, and for handling the financial consequences of Mr. Parson's death. Mr. Parson's will specified that Mrs. Parson was to receive all of his business assets and interests, and act as legal representative on behalf of the businesses.

**Verified First Amended Complaint**          8

2.   **Allstate refuses to recognize Mrs. Parson as designated legal representative and permissible seller of Michael Bradley Parson's agency despite valid documentation and prospective buyers.**

35. On or about August 4, 2020, Mrs. Parson contacted FSL Ryan Drennon ("**FSL Drennon**") to inform her of Mr. Parson's passing. FSL Drennon acknowledged that Mrs. Parson, as Mr. Parson's legal designee, owned the agency and had ninety days to sell the agency beginning on July 1, 2020, the date of Mr. Parson's passing. FSL Drennon also advised that Allstate required Mr. Parson's death certificate.

36. On or about August 5, 2020, FSL Drennon contacted Mrs. Parson and advised that Allstate also required the S-Corporation agency's Articles of Incorporation.

37. On or about August 10, 2020, Mrs. Parson confirmed with FSL Drennon that she had located the Articles of Incorporation, and noted that Mr. Parson's will named Mrs. Parson as beneficiary of all stocks, accounts, and businesses. Because the S-Corporation agency was all stock, Mrs. Parson was thereby the owner. Mrs. Parson also advised FSL Drennon that she had already been contacted by a prospective buyer and asked FSL Drennon for the value of the book so she could continue negotiations with the prospective buyer.

38. On or about August 12, 2020, Mrs. Parson sent the Articles of Incorporation to FSL Drennon. FSL Drennon then advised that Allstate would not accept the Articles of Incorporation, even though Mr. Parson's will explicitly named Mrs. Parson as the owner of Mr. Parson's business assets, and that Allstate would not move forward with any prospective buyer without a "clear" directive that Mrs. Parson could make business decisions on behalf of the agency. Mr. Parson's will, a legal and binding document, authorized Mrs. Parson to act, but Allstate refused to accept it as it was not the specific document Allstate was looking for.

**Verified First Amended Complaint**            9

39. FSL Drennon, on behalf of the Allstate corporate office, then advised Mrs. Parson that Allstate required a copy of Mr. Parson's will and death certificate. Mrs. Parson advised that she would send as soon as she received the death certificate from the mortuary.

40. On or about August 13, 2020, FSL Drennon confirmed receipt of both Mr. Parson's will and death certificate.

41. On or about August 19, 2020, nearly a week after sending the will and death certificate without a response, Mrs. Parson contacted FSL Drennon to inquire whether Allstate had confirmed Mrs. Parson as the legal representative of the agency. FSL Drennon stated that no decision had been made, meaning Allstate would still not allow Mrs. Parson to enter negotiations with a potential buyer, even though the ninety day-time frame to sell the agency continued to run.

**3.   Allstate requires Mrs. Parson to initiate court proceedings to obtain a Letter of Testimony as Mr. Parson's landlord threatens to close the agency office.**

42. On or about August 25, 2020, FSL Drennon advised Mrs. Parson that the Allstate corporate office requested a Letter of Testimony authorized and signed by a judge with a raised seal which establish prove Mrs. Parson's legal right as an authorized representative of the S-Corporation and estate.

43. Mrs. Parson expressed concern about the ninety-day time frame as nearly a month had passed and Allstate still refused to recognize her as legal representative of the agency. Mrs. Parson expressed suspicions that Allstate appeared to be attempting to "run out the clock." Mrs. Parson then requested an extension on the time frame since Allstate was requiring her to initiate a potentially lengthy court proceedings, particularly given the courts were not operating at full capacity due to the COVID-19 pandemic.

**Verified First Amended Complaint**          10

44. Mrs. Parson told FSL Drennon that she had spoken with Chris Arthurs (**"Mr. Arthurs"**), Mr. Parson's original FSL, who had worked with Allstate as an FSL for thirty years. Mr. Arthurs stated he had never witnessed Allstate require so much documentation from a surviving spouse, which was significant given the additional documentation requirements were made clear to Mrs. Parson only after Mr. Parson's very untimely passing. Additionally, Mrs. Parson told FSL Drennon that when she originally spoke to FSL Means after Mr. Parson's diagnosis, FSL Means assured Mrs. Parson that it would be an easy and automatic transfer. Neither FSL Means nor any other Allstate representative ever notified Mrs. Parson that there was an outstanding document that needed to be executed prior to Mr. Parson's passing, even when Mrs. Parson met with FSL Means for the express purposed of ensuring all proper documentation was in order before Mr. Parson passed away. FSL Drennon agreed with Mrs. Parson that it was "surprising" how the Allstate corporate office was handling the transfer and the extent they were requiring Mrs. Parson to do and produce.

45. Mrs. Parson offered to send pages from Mr. Parson's active Living Trust until the court signed the Letter of Testimony for the will. Mrs. Parson then sent FSL Drennon the pages of Living Trust, which stated that the will was legally binding.

46. On or about August 28, 2020, Mrs. Parson contacted FSL Drennon and explained that the bank which housed Mr. Parson's business account would not allow her access to the business account until she was approved by Allstate and that she required access to this account in order to pay the agency's bills. It was only at this time, upon Mrs. Parson reaching out, that FSL Drennon informed her that the Allstate corporate office did not approve the Living Trust. Mrs. Parson was still not authorized by Allstate to sell Mr. Parson's agency, even as the ninety-day time frame was

still running.

47. FSL Drennon advised that she would request an extension on the ninety-day time frame for Mrs. Parson to sell the agency. Upon information and belief, FSL Drennon requested an extension on at least three separate occasions, and was denied by Allstate each time.

48. On or about September 10, 2020, the court signed and sealed the Letter of Testimony, which was then sent to FSL Drennon.

49. On or about September 11, 2020, FSL Drennon called Mrs. Parson to inform her—not of any update on her status to sell the agency—but that the landlord of the agency office told FSL Drennon that if he did not receive the rent payment immediately, he would padlock the agency office door. Because Mrs. Parson could not access the business account to pay for the rent until she was approved as legal representative by Allstate, Mrs. Parson was forced to pay for two months of rent with her personal funds in order to keep the agency open.

50. Also on or about September 11, 2020, Mrs. Parson informed FSL Drennon that two longstanding Allstate agents, Art Stover and Gigi Stover, were interested in buying Mr. Parson's agency book. Mrs. Parson asked FSL Drennon to contact them, but FSL Drennon directed Mrs. Parson to have Gigi Stover contact FSL Means.

51. When Mrs. Parson contacted Gigi Stover, Gigi Stover told her that she had already placed several unanswered calls to FSL Means and was still awaiting a response.

52. On or about September 14, 2020, Mrs. Parson still had not heard from FSL Drennon or any Allstate representative as to whether the Letter of Testimony was sufficient to recognize Mrs. Parson as authorized to sell the agency. Mrs. Parson called and left a message for FSL Drennon regarding whether the Allstate corporate office would accept the Letter of Testimony

**Verified First Amended Complaint**                    12

from the court.

**4.     Allstate finally recognizes Mrs. Parson as legal representative of the agency but refuses to consider legitimate, prospective buyers.**

53. On or about September 15, 2020, five days after Allstate received the initial copy of the Letter of Testimony, FSL Drennon informed Mrs. Parson that the Allstate corporate office required a new photograph of the seal on the Letter of Testimony to determine whether it was raised. Mrs. Parson immediately sent a new photograph of the Letter of Testimony which Allstate then accepted. Allstate then requested that Mrs. Parson sign a number of new documents, which she also did immediately. FSL Drennon also informed Mrs. Parson that the Allstate corporate office intended to deny the sale of the agency book to Art and Gigi Stover.

54. Gigi Stover then notified Mrs. Parson that FSL Means informed Gigi Stover that Allstate intended to deny the purchase of the book because although Gigi and Art Stover had high life insurance numbers, Allstate informed them that their rolling total sum of sales from the past twelve months were off by one application. Gigi Stover rectified this discrepancy and attempted to complete the sale through a broker, but the broker informed her that the deal was denied without further clarification.

**5.     Allstate refers Mrs. Parson to broker Deb Dykes who attempts to convince Mrs. Parson to wait to sell as the ninety-day time frame expires.**

55. FSL Drennon subsequently advised Mrs. Parson to contact Deb Dykes ("**Ms. Dykes**"), an insurance agency broker, to facilitate the sale of the agency. Mrs. Parson knew Ms. Dykes to be a broker associated with Allstate.

**Verified First Amended Complaint**          13

56. Mrs. Parson contacted Ms. Dykes to contract to broker the sale of the agency. Mrs. Parson gave Ms. Dykes the names of two potential buyers and noted it was vital that they be aggressive in pursuing a sale given it was approximately forty-five days into Allstate's ninety-day time frame to sell the agency. Ms. Dykes countered that there was "no rush" because she was confident that Allstate would extend the time frame and that Ms. Dykes would find buyers.

57. On or about September 18, 2020, Gigi Stover contacted Mrs. Parson to notify her that for several days she had been attempting to contact FSL Means to confirm that they had remedied the rolling totals issue. Presumably Art and Gigi Stover would then be approved by Allstate to purchase the agency given they were already approved Allstate agents, but neither FSL Means nor any other Allstate representative returned Gigi Stover's calls, texts, or emails.

58. On or about September 21, 2020, Gigi Stover called Ms. Dykes to start negotiations The same day, Mrs. Parson left a message for Ms. Dykes regarding the status on the two proposed buyers that Mrs. Parson had given to Ms. Dykes.

59. On or about September 22, 2020, approximately one week until the expiration of the ninety-day time frame, Ms. Dykes claimed to Mrs. Parson that none of the leads—including Gigi and Art Stover—were "serious" and told Mrs. Parson to be "patient."

6. **Allstate initiates steps to close the agency as Mrs. Parson is unable to reach any representatives from Allstate regarding the agency closure and prospective buyers.**

60. On or about October 1, 2020, without Mrs. Parson's advance knowledge, Allstate instructed a sign company to remove all "Parson" signage from Mr. Parson's agency office building. Mrs. Parson immediately called the sign company, which informed her that the sign company was acting on Allstate's orders. At this point, no FSL nor any other Allstate

**Verified First Amended Complaint**      14

representative had informed Mrs. Parson that the agency would be closed. Mrs. Parson called

FSL Drennon for explanation. FSL Drennon temporarily halted the sign order, but did not

provide Mrs. Parson any additional clarification on the status of the agency.

61. On or about October 7, 2019, FSL Drennon informed Mrs. Parson that she was going

on maternity leave and that Mrs. Parson's new FSL would be FSL Means.

62. Mrs. Parson immediately called FSL Means and received FSL Means' voice

answering machine which stated that FSL Means was out of the country until October 28, 2020.

The answering machine did not provide an emergency contact.

63. Mrs. Parson called FSL Drennon to explain she could not reach FSL Means. FSL

Drennon assured Mrs. Parson that someone else would be appointed to assist her and would that

the person would reach out to her. FSL Drennon also noted she would file for an extension for

Mrs. Parson and added that given Mrs. Parson had at least three potential buyers, she was very

confident that the extension would be approved.

64. On October 14, 2020, one week after FSL Drennon assured Mrs. Parson that her new

representative would contact her, Mrs. Parson was still waiting for communication from Allstate.

Mrs. Parson texted FSL Drennon for the contact information of her new Allstate representative.

FSL Drennon did not respond.

65. On October 20, 2020, now two weeks after FSL Drennon assured Mrs. Parson that her

new representative would contact her, Mrs. Parson was still waiting for communication from

Allstate. Mrs. Parson again texted FSL Drennon for the contact information of her new Allstate

representative.

**Verified First Amended Complaint**          15

66. Because FSL Drennon and other Allstate representatives were seemingly ignoring or avoiding her, Mrs. Parson contacted Gigi Stover to see if she had any information on new Allstate contacts. Gigi Stover gave Mrs. Parson the contact information for FSL Ashley Camp ("**FSL Camp**.")

67. Mrs. Parson contacted FSL Camp, who expressed surprise at the way Allstate and its representatives were handling Mrs. Parson's situation. FSL Camp noted that perhaps Mrs. Parson had "fallen through the cracks" when multiple FSLs were unavailable. FSL Camp assured Mrs. Parson that FSL Camp was very confident that Allstate would grant an extension on the ninety-day time frame and approve Gigi Stover to purchase the agency book.

68. Moments later, FSL Camp called Mrs. Parson back and notified her that she was unable to get the extension or approve the sale to Gigi Stover. FSL Camp was very apologetic and noted the Allstate corporate office said "no" without further context or explanation.

> **7.** **Allstate notifies Mrs. Parson they are closing the agency and Mrs. Parson has three days to complete a thirty-day checklist of tasks.**

69. On or about October 27, 2020, Allstate representative Brenda Trusch ("**Ms. Trusch**") emailed Mrs. Parson to notify her that Allstate would be shutting down the agency on October 30, 2020, three days later. Ms. Trusch sent Mrs. Parson a thirty-day checklist and informed that Mrs. Parson that she had only three days to complete every item. Ms. Trusch also warned Mrs. Parson that if she did not complete every item on the list, Allstate would not give her TPP of approximately $223,000 and she would be left with nothing.

70. Mrs. Parson subsequently completed thirty days of closing tasks in three days to receive TPP, a sum significantly under the market value of the agency.

**Verified First Amended Complaint**       16

71. Mrs. Parson simultaneously was grieving her husband and comforting her two young daughters, but was forced to be away from her daughters for significant periods of time as she tried to sell the agency and complete the closing tasks, which heightened her daughters' feelings of loss and abandonment. Additionally, because this largely occurred during the COVID-19 pandemic, Mrs. Parson was unable to have family or friends stay with her daughters while she was away, leaving her two young daughters to grieve the sudden loss of their father alone.

### 8. Allstate compels Mrs. Parson to accept TPP in an amount significantly less than the value of the book.

72. Upon information and belief, Allstate subsequently gave Mr. Parson's book to an Allstate agent named Jason Pressley, which was a financially advantageous move for Allstate given it was substantially more cost-effective for Allstate to reassign the book of business than allow it to be purchased.

73. Inexplicably, Mr. Parson's customers were routed to a location forty-five minutes away, despite there being other Allstate agents in the region, including Gigi and Art Stover, and despite Art Stover taking over the lease of the physical location of Mr. Parson's agency. Many of these clients had been using the same agency office for three decades.

74. The EA Agreement is an enforceable contract, and Allstate has a clear duty under the EA Agreement to refrain from interfering in negotiations for agency sales. Allstate interfered in negotiations for the sale of Mr. Parson's agency when Allstate refused to recognize Mrs. Parson as the legal representative of the agency, despite having a valid will and signed testimony from the court, for nearly the entirety of the imposed time frame to sell the agency which prevented Mrs. Parson from operating the agency, paying bills, and, most importantly, selling the agency.

**Verified First Amended Complaint**          17

75. Allstate interfered in negotiations for the sale of Mr. Parson's agency by referring Mrs. Parson to a broker who attempted to convince Mrs. Parson to postpone finding a buyer to Mrs. Parson's detriment as the imposed time frame to sell expired before Allstate approved a sale.

76. Allstate interfered in negotiations for the sale of Mr. Parson's agency when multiple FSL representatives of Allstate repeatedly and erroneously assured Mrs. Parson that she would be given an extension on the imposed time frame and that the sale to Art and Gigi Stover would be approved.

77. Allstate interfered in negotiations for the sale of Mr. Parson's agency when it left Mrs. Parson without a valid Allstate contact person in the final days of the imposed time frame as Mrs. Parson grew more desperate for a sale to be approved to one of the at least three potential buyers, including Allstate agents who had previously been approved by Allstate to operate an agency.

78. The fair market value of Mr. Parson's book of business was valued at $480,000 based upon commonly accepted agency valuation techniques.

79. Instead of receiving proceeds from the sale of the book, Mrs. Parson was forced to accept TPP, which was approximately $257,000 less than the proceeds from the sale of the book.

80. Because of this material breach, the Estate of Michael Bradley Parson, through Administrator Mrs. Parson, suffered damages in excess of $257,000.

/ / /

/ / /

/ / /

/ / /

**Verified First Amended Complaint**          18

**B.** **Allstate's Interference in the Sale of Plaintiff Brandon C. Rondon's Agency**

    **1.** **Mr. Rondon's Allstate agency becomes the fastest-growing agency in Oklahoma and qualifies for Inner Circle Elite.**

81. On or about March of 2019, Brandon C. Rondon initiated training to become an Allstate agent after learning of Allstate's Enhanced Compensation Program ("**ECP**"). Mr. Rondon had previously worked as an agent with Allstate's competitor Farmers Insurance for ten years.

82. On or about June 1, 2019, Mr. Rondon opened his Allstate agency with three other agents who had left Farmers Insurance to work for him. Mr. Rondon and his team poured their resources into marketing, hiring, and leads. This approach paid off and led Mr. Rondon and his team to write between $100,000 and 150,000 per month, significantly more than expected.

83. Mr. Rondon's team became the fastest growing agency in Oklahoma. By the end of 2019, Mr. Rondon's team qualified for "Inner Circle Elite," an award given for high standards in customer satisfaction and retention and profitable business growth. This award is Allstate's highest symbol of outstanding business achievement and is awarded to agents who have grown their agencies and served their customers in an exemplary manner. In 2020, Mr. Rondon's team became one of the top six Allstate teams in the country in terms of growth and sales.

84. Because Mr. Rondon's business was under the ECP, Allstate paid Mr. Rondon significantly higher commissions than it paid other Allstate agents not under the ECP. Upon information and belief, Allstate realized the ECP plan was exceeding estimated costs and subsequently began searching for reasons to terminate agents under the ECP, like Mr. Rondon.

**Verified First Amended Complaint**       19

### 2. Mr. Rondon contacts FSL Byron Dillahunty for instruction on how to prevent S-Cancelling.

85. On or about June of 2020, Mr. Rondon's Agency Manager, Brooke Gamache ("**Ms. Gamache**"), observed that policyholders were flat-cancelling their policies, meaning they were cancelling on the effective date, which was either the date the policy was to go into effect or the renewal date of the policy. Ms. Gamache learned from other Allstate agents experiencing the same issue that Allstate had introduced "s-canceling," which allowed policyholders to choose their payment date with an earlier inception date. Because Mr. Rondon and his team had no way to verify when the policy would be cancelled which led to a lapse in policy, the policyholder's bill increased.

86. For example, a customer would take out a policy on January 30th with a payment date on the 15th of each month that would be set to renew on June 30th. The customer would pay on June 15th, expecting to be covered through July 15th. Because the "renewal" date came on June 30th without the customer being informed they had to take action, Allstate would cancel the policy on June 30th. Meaning, if the customer got in an accident on July 3rd, he would find out he was no longer covered (when he had paid for coverage through July 14th).

87. On or about June of 2020, Mr. Rondon brought the s-canceling issue to the attention of FSL Byron Dillahunty ("**FSL Dillahunty**.") FSL Dillahunty instructed Mr. Rondon and his team to type a space in front of the client's name when entering the policy, which had the effect of "tricking" the system into getting in front of underwriting and not cancelling the policy. Notably, this method did not change Allstate's revenue. Mr. Rondon and his team began to enter policies as FSL Dillahunty instructed.

**Verified First Amended Complaint**              20

88. On or about January 5, 2021, Allstate sent an investigator to speak with Mr. Rondon regarding the process for avoiding policy cancellations. Mr. Rondon showed the Allstate investigator the texts and emails from FSL Dillahunty instructing him to follow this process.

89. The Allstate investigator informed Mr. Rondon that there was no correct process to prevent the policies from cancelling and told Mr. Rondon to allow the policies to cancel. Mr. Rondon and his team did as instructed. Mr. Rondon was never informed of any subsequent issues related to the policy cancellation issue.

90. On or about October of 2020, FSL Dillahunty told Mr. Rondon that Allstate was "coming after ECP" because of the significant commissions earned by ECP agents. Approximately one month later, on or about November of 2020, Allstate terminated FSL Dillahunty and ECP FSL Andy Hart.

### 3. Allstate terminates Mr. Rondon and prevents him from selling his agency at full market value to an eligible and approved buyer.

91. On or about March 1, 2021, FSL Craig Bursch ("**FSL Bursch**") and District Sales Leader Brad Heggem ("**District Sales Leader Heggem**") informed Mr. Rondon that Allstate intended to terminate Mr. Rondon's contract, even in spite of exemplary sales numbers and customer satisfaction and retention. Neither FSL Bursch nor District Sales Leader Heggem would tell Mr. Rondon the reason for terminating the contract, including whether it was for cause, and only told him to "refer to the contract."

92. On or about March 5, 2021, Allstate terminated Mr. Rondon's contract for unknown reasons. Because Mr. Rondon was an agent with Allstate for less than five years, he was not vested under the terms of his agreement and thus was ineligible for TPP. Allstate gave him ninety

**Verified First Amended Complaint**          21

days to sell his agency book of business.

93. Mr. Rondon immediately began searching for a buyer and presented a potential buyer, Daniel Arnette ("**Mr. Arnette**"), to FSL Bursch for approval.

94. Upon information and belief, FSL Bursch and Allstate leadership talked Mr. Arnette out of buying Mr. Rondon's book and instead convinced Mr. Arnette that there were "better books out there" and that he did not want Mr. Rondon's book. Mr. Arnette then purchased a different, cheaper, less profitable agency.

### 4. Mr. Rondon is investigated by the Oklahoma Department of Insurance following a frivolous claim by Allstate.

95. On or about June 30, 2021, as he tried to renew his license, Mr. Rondon learned he was being investigated by the Oklahoma Department of Insurance ("**DOI**") because Allstate had flagged Mr. Rondon's license for fraud. Mr. Rondon was never notified by any FSL or Allstate representative that Allstate intended to report him to the DOI.

96. Mr. Rondon called the DOI multiple times and finally learned that the DOI was investigating Mr. Rondon on a claim from Allstate. The claim stemmed from Mr. Rondon's interaction with a widowed woman who did not recall informing Mr. Rondon or his team that she was widowed. Mr. Rondon located the recording of the phone call and sent the recording to the Department of Insurance. Within an hour and a half, Mr. Rondon's license was reinstated and no further action was taken against Mr. Rondon. The Department of Insurance subsequently fined Allstate $15,000 for the frivolous claim.

/ / /

/ / /

**Verified First Amended Complaint**          22

**5.      Mr. Rondon sells his book for substantially less than its worth.**

97. Tracy Martino, another Allstate agent, ultimately bought Mr. Rondon's book for
$350,000. Although Allstate generally requires a purchaser to assume the remainder of a lease,
Allstate declined to do so, causing Mr. Rondon to be left paying approximately $3233 per month
for three more years on the office space lease.

98. Mr. Rondon's book was valued at $2.8 million and would have been expected to sell
for approximately $900,000 based upon commonly accepted agency valuation techniques.

99. The EA Agreement is an enforceable contract, and Allstate has a clear duty under the
EA Agreement to refrain from interfering in negotiations for agency sales. Allstate interfered in
negotiations for the sale of Mr. Rondon's agency when its employees dissuaded a potential buyer
from purchasing Mr. Rondon's agency and directing him to another, less expensive agency.
Because of this material breach Mr. Rondon suffered damages in excess of $550,000.

**C.      Allstate's Interference in the Sale of Plaintiff Catherine C. Hymel's Agency**

**1.      Ms. Hymel is pressured to sell her Allstate agency by FSL Doug
Caminita.**

100. Ms. Hymel initiated training to become an Allstate agent on or about March 29,
1989. Since that date, Ms. Hymel has worked as an Allstate agent in Metairie, Louisiana.

101. In or about 2018, Ms. Hymel's Field Sales Leader, Doug Caminita ("**FSL
Caminita**") attempted to convince Ms. Hymel to sell her agency to Allstate agent Glenn Liuza
("**Mr. Liuza**"). Ms. Hymel, then aged sixty-one, had expressed to FSL Caminiti that she
intended to retire at the age of sixty-five. Despite FSL Caminita's attempts, the sale did not go
through as Mr. Liuza stated that he was not in the market to purchase another agency.

**Verified First Amended Complaint**          23

102. In or about 2019, Ms. Hymel's FSL Caminita again attempted to convince Ms. Hymel to sell her agency, this time to Gina Molinar ("**Ms. Molinar**".)

103. Although FSL Caminita led Ms. Hymel to believe that Ms. Molinar had experience selling insurance with State Farm, Ms. Hymel eventually learned that Ms. Molinar was unlicensed, had no insurance sales background, and was currently employed in the human resources department at State Farm. Ms. Hymel also learned that Ms. Molinar was Mr. Caminita's girlfriend.

104. Ms. Hymel was hesitant to sell her agency to Ms. Molinar given Ms. Molinar's inexperience with selling insurance and with Allstate. Ms. Hymel's primary objective in completing the sale of her agency was to ensure that her clients, some of whom had been with her for many years, remained with a competent and experienced agent.

105. Despite her stated reluctance to sell to Ms. Molinar, FSL Caminita continued his attempts to convince Ms. Hymel to sell the agency to Ms. Molinar, to the point his behavior was unprofessional and bordered on harassment.

106. After Ms. Hymel declined to sell her agency to Ms. Molinar due to Ms. Molinar's inexperience and Ms. Hymel's intent that her current clients remain with a competent agent, FSL Caminita's attitude towards Ms. Hymel became increasingly dismissive and toxic. FSL Caminita refused to answer Ms. Hymel's call and emails, and blatantly ignored her at work meetings in front of other colleagues. FSL Caminita's behavior towards Ms. Hymel was noticeable to the point that other colleagues asked Ms. Hymel what she did to "piss off" FSL Caminita.

/ / /

/ / /

**Verified First Amended Complaint**     24

**2.     Ms. Hymel lists her agency for sale and receives several serious, competent offers.**

107. In February of 2020, Ms. Hymel listed her agency for sale. Throughout the process of selling her agency, Ms. Hymel had at least seven serious potential agents interested at various times in purchasing her agency.

108. On or about May 8, 2020, Agent Lee Fritze ("**Mr. Fritze**") submitted a verbal offer to purchase Ms. Hymel's agency. Mr. Fritze had fifteen years of experience and the life and health license. Mr. Fritze agreed to purchase Ms. Hymel's agency for $420,000 and Ms. Hymel agreed to continue working for six months after the purchase to ease the transfer of ownership.

109. FSL Codie Cavalier ("**FSL Cavalier**"), who was facilitating the sale of Ms. Hymel's agency to Mr. Fritze, suddenly left the employ of Allstate. Ms. Hymel contacted FSL Caminiti to replace FSL Cavalier to complete the sale, but FSL Caminiti refused to assist with the approval process or otherwise facilitate the sale to Mr. Fritze.

110. Upon information and belief, Mr. Caminiti was incentivized to block the transaction as he would not have received a $5,000 bonus if the sale to Mr. Fritze had been approved and processed as Mr. Fritze was onboarded to Allstate by FSL Cavalier.

111. Because FSL Caminiti refused to facilitate the sale to Mr. Fritze, Ms. Hymel contacted Allstate directly to determine who had seniority over FSL Cavalier and FSL Caminiti to complete the sale of her agency to Mr. Fritze.  Specifically, Ms. Hymel spoke with Allstate National Agency Establishment Coordinator Sherrick White ("**Mr. White**.") Ms. Hymel explained to Mr. White that Mr. Fritze was highly qualified and would be an asset to Allstate. Mr. White stated that he would reach out to FSL Caminiti to complete the sale but neither Mr.

**Verified First Amended Complaint**          25

Fritze nor Ms. Hymel ever heard from Mr. White or FSL Caminiti regarding the sale.

112. Because neither FSL Caminiti nor any other Allstate representative, including Mr. White, ever contacted Mr. Fritze, Mr. Fritze withdrew his verbal offer to purchase Ms. Hymel's agency.

113. On or around June 1, 2020, FSL Caminiti demanded that Ms. Hymel provide him with private information related to Ms. Hymel's broker compensation figures. Upon information and belief, FSL Caminiti was prohibited from asking about this information as it was unrelated to Ms. Hymel's Allstate business.

114. On or about September 14, 2020, Allstate agent Megan Dodge ("**Ms. Dodge**") submitted an offer in writing to purchase Ms. Hymel's agency for $420,000. Upon information and belief, Allstate required that all new agents complete the Series 6 license within eighteen months of their respective dates of hire but allowed extensions due to the ongoing COVID-19 pandemic.[5] Ms. Dodge was informed she failed the Series 6 licensing test and so was not approved to purchase Ms. Hymel's agency. Upon information and belief, Allstate later permitted Ms. Dodge to purchase a different Allstate agent's book and dropped the Series 6 licensure requirement.

115. On or around September 28, 2020, Jenny Vanderpool ("**Ms. Vanderpool**") from the Allstate National Establishment Team sent Ms. Hymel a contract for her signature to complete the sale of Ms. Hymel's agency to a Tanisha Evans ("**Ms. Evans**.") Ms. Hymel called Ms. Vanderpool to advise that she had never heard of Ms. Evans, and so had never negotiated the sale

---

[5] The Series 6 license, formerly known as Limited Investment Securities License, is administered by Financial Industry Regulatory Authority (FINRA) and is an entry-level license that introduces securities professionals to the financial service industry.

**Verified First Amended Complaint**      26

of Ms. Hymel's agency to Ms. Evans. Ms. Hymel advised this was a mistake made by Allstate.

**3. Allstate terminates Ms. Hymel's contract.**

116. On or around December of 2020, Allstate sent Ms. Hymel a ninety-day notice of termination for the contract for Ms. Hymel's agency. Allstate cited lack of production as the cause for termination as Ms. Hymel had not sold policies throughout 2020 because she was concurrently selling her agency. Allstate informed Ms. Hymel that she had ninety days to sell her agency.

117. Scott Stephens ("**Mr. Stephens**") contacted Ms. Hymel through Ms. Hymel's agency listing through the PPC Loan company. FSL Caminiti never spoke with Mr. Stephens but dismissed Mr. Stephens as a potential buyer without explanation and instead told Ms. Hymel that "we don't want him."

118. Agents Tabitha D'Aribba ("**Ms. D'Aribba**") and Beau Boudreau ("**Mr. Boudreau**") expressed interest in each purchasing half of Ms. Hymel's agency and dividing her book of business between them. Ms. D'Aribba and Mr. Boudreau had both been through Allstate training and started their own Allstate agencies. Additionally, Ms. D'Aribba and Mr. Boudreau had over eighteen months of experience with Allstate and three years of experience with State Farm. FSL Caminiti refused to allow Ms. D'Aribba and Mr. Boudreau to divide the book of business because they were too "new" of agents and denied the sale.

119. Jon Jackel ("**Mr. Jackel**") expressed interest in purchasing Ms. Hymel's agency after FSL Caminiti presented him as a potential buyer to Ms. Hymel. FSL Caminiti subsequently refused to approve the sale to Mr. Jackel until Mr. Jackel obtained his property and casualty license. When Mr. Jackel did obtain this licensure, FSL Caminiti never notified Ms. Hymel that

Mr. Jackel had met the requirement to purchase her agency. Instead, FSL Caminiti told Ms. Hymel it was time to pursue other buyers and presented Mr. Jackel as a potential buyer to another Allstate agent. Mr. Jackel eventually purchased the other Allstate agent's book.

120. Allstate agent Shawn Coffey ("**Mr. Coffey**") offered Ms. Hymel $382,000 in cash for her Allstate agency on or around February 15, 2021. Ms. Hymel presented the offer that FSL Caminiti and Allstate Agency Manager Dallas Owen ("**Manager Owen**") and received approval to pursue the offer.

121. On or around February 16, 2021, the day after Mr. Coffey offered to purchase Ms. Hymel's agency, Manager Owen and FSL Caminiti called Mr. Coffey and informed him that they would not approve the sale of Ms. Hymel's agency unless he agreed to keep the physical office location open. As a result of this conversation and condition, Mr. Coffey withdrew his offer.

    **4.**     **Allstate notifies another agent that Ms. Hymel's contract had been terminated prior to the expiration of Ms. Hymel's ninety-day time frame to sell her agency, effectively interfering in potential sales of her agency**

122. Kenya Morgan ("**Ms. Morgan**") was then referred by FSL Rhonda Murdock ("**FSL Murdock**") to Ms. Hymel as a potential buyer. Upon information and belief, Ms. Morgan was at the time employed in retail clothing sales and had no experience in the insurance industry. Ms. Morgan advised that she did not have the money to purchase Ms. Hymel's agency, but FSL Murdock would assist her with the loan process. Ms. Hymel was hesitant to consider Ms. Morgan as a serious buyer in light of her inexperience, but scheduled a meeting with Ms. Morgan since she had been referred by FSL Murdock. However, Ms. Morgan never showed up for the initial interview with Ms. Hymel.

/ / /

**Verified First Amended Complaint**       28

123. Concurrently, Agent Adam Levenway ("**Mr. Levenway**") expressed interest in purchasing Ms. Hymel's agency. After advising Ms. Hymel that he would like to purchase her book, Mr. Levenway stopped returning Ms. Hymel's calls. Upon information and belief, at least three weeks before Ms. Hymel's ninety-day window to sell her agency expired, Allstate informed Mr. Levenway that Allstate would be giving Ms. Hymel's book of business to Mr. Levenway free of charge.[6] As a result, Mr. Levenway purposely evaded Ms. Hymel as he knew he would receive Ms. Hymel's book of business without purchasing Ms. Hymel's interest in it.

124. Ten days before the window to sell her agency closed, Allstate gave Ms. Hymel's book of business to Mr. Levenway.[7] Like Mr. Coffey, Mr. Levenway had another Allstate location approximately six to eight blocks from Ms. Hymel's agency office. FSL Caminiti and Manager Owen allowed Mr. Levenway to operate Ms. Hymel's book of business without keeping the physical office of Ms. Hymel's agency open, despite previously informing Mr. Coffey that he would have to keep the physical office open as a condition of the sale.

125. On or around February of 2021, Allstate began utilizing a new telephone system, AAV. Allstate estimated it would take approximately one year for all Allstate agents in Louisiana to onboard with the new system. Because Ms. Hymel's office was closing less than two weeks later, the administrator of the telephone system agreed to postpone implementing the new system

---

[6] Ms. Hymel knew this to be the practice of Allstate, as Ms. Hymel was aware that on or around June of 2020, Allstate terminated an agent named Saulo Almendares ("**Mr. Almendares**") Following Mr. Almendares's termination, FSL Caminiti gave Mr. Almendares's policies to other agents at FSL Caminiti's discretion.

[7] Upon information and belief, Allstate awarded preferential treatment to some agents selling their agencies. For example, Allstate agent Donna Bianchini Tully was given an additional five months to sell her agency even after the ninety-day time frame expired.

**Verified First Amended Complaint**      29

at Ms. Hymel's office so that she could close the office without onboarding. FSL Caminiti overrode this decision and insisted that Ms. Hymel's office be equipped with the new system, which caused Ms. Hymel to pay additional costs and closed access to her computer, even as Ms. Hymel's agency closed days later. Upon information and belief, other agents in the area were not required to get the AAV system for as long as six months later.

126. On or around February 28, 2021, Allstate terminated Ms. Hymel's contract for her agency and the ninety-day time frame to sell her agency expired.

127. Upon information and belief, FSL Caminiti and FSL Murdock[8] had to meet hiring quotes, which explained the denial of otherwise-qualified potential purchasers.

128. Because Ms. Hymel was unable to sell her book, she was forced to accept TPP.

129. The market value of Ms. Hymel's book of business was valued at $420,000 based upon commonly accepted agency valuation techniques.

130. Instead of receiving proceeds from the sale of the book, Ms. Hymel was forced to accept TPP in the amount of $148,000, which was approximately $272,000 less than the proceeds from the sale of the book.

131. Because of this material breach, Ms. Hymel suffered damages in excess of $272,000.

## VI. Allstate's Bad Faith Denial of the Sale of Decedent Agent Michael Bradley Parson's Agency and Mr. Rondon's Agency

132. Plaintiffs re-allege and incorporate by reference paragraphs 1-95.

133. Good faith and fair dealing is an implied contract term that exists in all contracts.

---

[8] Upon information and belief, Allstate terminated FSL Murdock's position as field sales leader prior to Ms. Hymel's contact termination, but allowed her to purchase a book of business and continue working with Allstate as an agent.

**Verified First Amended Complaint**      30

_McCleary v. Wells Fargo Securities, L.L.C._, 2015 IL App (1st) 141287, ¶ 19.

134. When a contract "specifically vests one of the parties with broad discretion in performing a term of the contract, the covenant of good faith and fair dealing requires that the discretion be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." _Id._ (internal citations omitted).

135. Allstate is allowed broad discretion in approving or denying sales. "The Company shall have the right to approve or disapprove the sale of the economic interest in the book at any time up until the time the transfer of the economic interest has occurred." Manual at 39.

136. Because Allstate has broad discretion in approving or denying agency sales, its discretion must be exercised with good faith and fair dealing.

137. EAs should be able to reasonably expect that under the EA Agreement, Allstate will approve an objectively qualified buyer to purchase his or her book of business.

**A.     Allstate's Denial of the Sale of Mrs. Parson's Agency**

138. Even though Art and Gigi Stover were objectively qualified buyers for Mr. Parson's book of business, particularly because they were previously-approved Allstate buyers and had the requisite sales numbers to be approved for the purchase of Mr. Parson's book, Allstate refused to timely recognize Mrs. Parson as the legal representative of the agency, which prevented her from selling the agency. At the advice of Allstate representative FSL Drennon, Mrs. Parson retained broker Deb Dykes, who attempted to convince Mrs. Parson to wait to sell the agency to her detriment as the time frame to sell expired. FSLs Drennon and Camp assured Mrs. Parson that

**Verified First Amended Complaint**          31

Allstate would grant an extension on the time frame to sell and approve the sale to Art and Gigi Stover.

139.    Upon information and belief, Allstate's management wanted Mrs. Parson's ninety-day time frame to sell the agency to pass so that Allstate could give the agency to Jason Pressley at a lower rate of commission in a financially advantageous move for Allstate.

140. Allstate breached its duty of good faith and fair dealing when it stranded Mrs. Parson without a viable Allstate contact person in the final days of the time frame Allstate imposed on Mrs. Parson to sell the agency, as FSL Means was allegedly out of the country, FSL Drennon failed to respond to Mrs. Parson, and FSL Camp failed to contact Mrs. Parson.

141. The EA Agreement is an enforceable contract, and Allstate has a clear duty under the EA Agreement to exercise its broad discretion in approving or denying sales in good faith and with fair dealing. Allstate breached the contract and interfered in negotiations for the sale of Mr. Parson's agency when it failed to recognize Mrs. Parson as the legal representative of the agency, when through its representatives attempted to convince Mrs. Parson that Allstate would grant an extension on the time frame and approve the sale to Art and Gigi Stover, and when through its representatives evaded Mrs. Parson's communication and sales attempts in the final days of her imposed time frame to sell the agency. Because of this material breach, the Estate of Michael Bradley Parson, through Administrator Mrs. Parson, suffered damages in excess of $257,000.

**B.    Allstate's Denial of the Sale of Mr. Rondon's Agency**

142. Even though Mr. Arnette was an objectively qualified buyer for Mr. Rondon's book of business, Allstate FSL Bursch and Allstate leadership directed Mr. Arnette not to purchase Mr.

Rondon's agency.

143. Upon information and belief, Allstate's management, including FSL Bursch, wanted Mr. Arnette to buy a different agency, in large part because of the financial incentive for Allstate.

144. Allstate breached its duty of good faith and fair dealing when it discouraged Mr. Arnette from purchasing Mr. Rondon's agency in favor of purchasing a cheaper, less profitable agency on the basis of financial gain.

145. The EA Agreement is an enforceable contract, and Allstate has a clear duty under the EA Agreement to exercise its broad discretion in approving or denying sales in good faith and with fair dealing. Allstate breached the contract and interfered in negotiations for the sale of Mr. Rondon's agency when its employees discouraged a potential buyer from the sale of Mr. Rondon's agencies, resulting in a lower sale price of Mr. Rondon's agency. Because of this material breach, Mr. Rondon suffered damages in excess of $550,000.

### C.     Allstate's Denial of the Sale of Ms. Hymel's Agency

146. Upon information and belief, Allstate's management, including FSL Caminiti, notified at least one potential buyers, Mr. Levenway, that he would be given Ms. Hymel's book of business without purchasing Ms. Hymel's financial interest in the book if Ms. Hymel did not sell within the ninety-day time frame.

147. Additionally, even though Mr. Jackel was an objectively qualified buyer for Ms. Hymel's book of business after he passed his licensure requirements, Allstate FSL Caminiti directed Mr. Jackel to purchase a different agency.

**Verified First Amended Complaint**          33

148. Allstate breached its duty of good faith and fair dealing when it discouraged Mr. Levenway and Mr. Jackel from purchasing Ms. Hymel's agency.

149. The EA Agreement is an enforceable contract, and Allstate has a clear duty under the EA Agreement to exercise its broad discretion in approving or denying sales in good faith and with fair dealing. Allstate breached the contract and interfered in negotiations for the sale of Ms. Hymel's agency when its employees discouraged a potential buyer from the sale of Mr. Hymel's agency and notified another buyer that he would potentially receive the book of business without purchasing Ms. Hymel's financial interest, resulting in Ms. Hymel having to accept TPP. Because of this material breach, Ms. Hymel suffered damages in excess of $272,000.

## VII.  Allstate's Unjust Terminations for Cause

150. Good faith and fair dealing is an implied contract term that exists in all contracts. _McCleary v. Wells Fargo Securities, L.L.C._, 2015 IL App (1st) 141287, ¶ 19.

151. When a contract "specifically vests one of the parties with broad discretion in performing a term of the contract, the covenant of good faith and fair dealing requires that the discretion be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." _Id._ (internal citations omitted).

152. Allstate has broad discretion to terminate an EA Agreement, with cause, "immediately upon providing written notice to Agency. Cause may include, but is not limited to, breach of this Agreement, fraud, forgery, misrepresentation or conviction of a crime. The list of examples of cause just stated shall not be construed to exclude any other possible ground as

cause for termination." *Allstate R3001C Exclusive Agency Agreement*, Section XVII, Termination of Agreement at 8-9.

153. Because Allstate has broad discretion in terminating an EA agreement, its discretion must be exercised with good faith and fair dealing.

154. EAs should be able to reasonably expect that under the EA Agreement, Allstate will not terminate an EA's agency for arbitrary and capricious reasons, or for minor infractions that are corrected and that are common under the ordinary course of dealing.

A.    **Mr. Rondon's Termination for Cause**

155. On or about March 5, 2021, Allstate gave notice that Mr. Rondon's EA Agreement was being terminated.

156. Although Allstate did not state a "for cause" reason for the termination, upon information and belief, it was related to either the automatic policy cancellations or the baseless fraud investigation.

157. After Mr. Rondon informed FSL Dillahunty that the policies were automatically cancelling without notice to Mr. Rondon, FSL Dillahunty instructed Mr. Rondon to type a space in front of the client's name to trick the system into getting in front of underwriting and ultimately not cancel the policy. Mr. Rondon and his team followed this instruction. After Allstate sent an investigator to speak with Mr. Rondon regarding this process for avoiding policy cancellations, Mr. Rondon showed the Allstate investigator the texts and emails from FSL Dillahunty. The Allstate investigator then informed Mr. Rondon there was no correct process to prevent the policies from cancelling and to allow the policies to cancel. Mr. Rondon did as

**Verified First Amended Complaint**          35

instructed and assumed the matter was resolved.

158. On or about June 30, 2021, Mr. Rondon learned he was being investigated by the Oklahoma Department of Insurance because Allstate had flagged Mr. Rondon's license for fraud. The allegation stemmed from Mr. Rondon's interaction with a widowed woman who did not recall informing Mr. Rondon or his team that she was widowed. Mr. Rondon located the recording of the phone call and sent the recording to the Department of Insurance. Within an hour and a half, Mr. Rondon's license was reinstated and no further action was taken against Mr. Rondon. The Department of Insurance subsequently fined Allstate $15,000 for the frivolous claim.

159. Despite the apparent resolution to both the automatic policy cancelling and baseless fraud investigation, Allstate presumably used one or both as a basis for terminating Mr. Rondon's agency for cause.

160. Allstate's termination of Mr. Rondon's agency for cause after the (fully resolved) "violation" was a breach of its duty to act in good faith and with fair dealing. Allstate's termination of Mr. Rondon's agency was arbitrary and capricious and contrary to Mr. Rondon's reasonable expectations under the EA Agreement, given the course of dealing between the parties.

161. Mr. Rondon planned to continue growing his agency for years to come. Because of Allstate's breach, Mr. Rondon suffered monetary damages equal to his reasonably expected income, plus the additional value a larger book of business would have reasonably netted in a future sale, plus the costs associated with the leases. These losses total over $665,000.

**Verified First Amended Complaint**          36

**COUNT I:**

*Plaintiff Jennifer L. Parson, as Administrator of the Estate of Michael Bradley Parson,*
*Against Defendant*

**Breach of Contract[9] for**
**Allstate's Interference in the Sale of Decedent Agent Michael Bradley Parson's Agency**

162. Mrs. Parson re-alleges and incorporates by reference the preceding paragraphs 30-80.

163. Allstate has contractual discretion in deciding whether to approve or deny agency sales, but Allstate is not authorized under the EA Agreement to interfere in the negotiations between a agency buyer and seller. *See* ¶¶ 11-25.

164. Allstate breached the contract when it failed to timely recognize Mrs. Parson as the legal representative of the agency, when through its representatives attempted to convince Mrs. Parson that Allstate would grant an extension on the time frame and approve the sale to Art and Gigi Stover, and when through its representatives evaded Mrs. Parson's communication and sales attempts in the final days of her imposed time frame to sell the agency. Because of this material breach, the Estate of Michael Bradley Parson, through Administrator Mrs. Parson, was given approximately $223,000 in place of the proceeds from the sale of the book worth approximately $480,000, thereby suffering monetary damages in excess of in excess of $257,000.

/ / /

/ / /

---

[9] The elements of a breach of contract claim are (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) resultant injury to the plaintiff. *Pepper Const. Co. v. Palmolive Tower Condominiums,* LLC, 59 N.E.3d 41 (Ill. App. Ct. 2016).

**Verified First Amended Complaint**      37

## COUNT II:

*Plaintiff Brandon C. Rondon Against Defendant*

**Breach of Contract for
Allstate's Interference in the Sale of Brandon C. Rondon's Agency**

165. Mr. Rondon re-alleges and incorporates by reference the preceding paragraphs 81-99.

166. The EA Agreement is an enforceable contract, and Allstate has a clear duty under the EA Agreement to refrain from interfering in negotiations for agency sales. Allstate breached the contract when it interfered with the negotiations between Mr. Rondon and Mr. Arnette by directing Mr. Arnette to purchase another, less expensive agency. Because of Allstate's material breach, Mr. Rondon suffered damages in excess of $665,000. *See* ¶¶ 15-29.

## COUNT III:

*Plaintiff Brandon C. Rondon Against Defendant*

**Breach of Contract,
Premised on Allstate's Unjust Terminations for Cause, of Mr. Rondon's Agencies**

167. Mr. Rondon re-alleges and incorporates by reference the preceding paragraphs 81-99.

168. Although Allstate did not state a "for cause" reason for Mr. Rondon's termination, upon information and belief, it was related to either the automatic policy cancellations or the baseless fraud investigation.

169. Despite the apparent resolution to both the automatic policy cancelling and baseless fraud investigation, Allstate presumably used one or both as a basis for terminating Mr.

**Verified First Amended Complaint**      38

Rondon's agency for cause.

170. Allstate's termination of Mr. Rondon's agency for cause after the (fully resolved) "violation" was a breach of its duty to act in good faith and with fair dealing. Allstate's termination of Mr. Rondon's agency was arbitrary and capricious and contrary to Mr. Rondon's reasonable expectations under the EA Agreement, given the course of dealing between the parties.

171. Mr. Rondon planned to continue growing his agency for years to come. Because of Allstate's breach, Mr. Rondon suffered monetary damages equal to his reasonably expected income, plus the additional value a larger book of business would have reasonably netted in a future sale, plus the costs associated with the lease. These losses total over $665,000.

## COUNT IV:

*Plaintiff Jennifer L. Parson Against Defendant*

### Negligent Infliction of Emotional Distress

172. Mrs. Parson re-alleges and incorporates by reference the preceding paragraphs 30-80.

173. From approximately August of 2020 to October of 2020, following Decedent Agent Brad Parson's tragic passing, Mrs. Parson attempted to sell Mr. Parson's agency within the ninety-day time frame imposed by Allstate, while simultaneously mourning his loss and comforting her grieving young children.

174. To succeed on a claim for negligence, a plaintiff must set out facts that establish the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury

**Verified First Amended Complaint**      39

proximately caused by that breach. The determination of whether a duty exists—whether the defendant and the plaintiff stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff—is an issue of law to be determined by the court." *Kirk v. Michael Reese Hospital & Medical Center,* 117 Ill.2d 507, 525 (1987). In determining whether to impose a duty upon a defendant, a court will look at various policy considerations, such as the likelihood of harm, the gravity of the injury, the burden of guarding against the injury, and the relationship between the parties. *See Horak v. Biris*, 130 Ill.App.3d 140, 145 (1985).

175. Allstate had a clear duty to the Estate of Mr. Parson under the EA Agreement to approve or deny the sale of the agency in good faith and with fair dealing.

176. Allstate therefore had a duty to timely recognize Mrs. Parson as the legal representative of the agency, particularly given Allstate had a valid will and signed testimony from the court which stated that Mr. Parson left his business affairs to Mrs. Parson.

177. Allstate breached its duty in refusing to timely recognize Mrs. Parson as Mr. Parson's legal representative which prevented Mrs. Parson from paying the agency's bills, which then forced her to use her personal savings to keep the agency open, and prevented Mrs. Parson from selling the agency at full market value.

178. Allstate breached its duty in referring Mrs. Parson to a broker who attempted to convince Mrs. Parson to postpone finding a buyer, to Mrs. Parson's detriment, as the imposed time frame to sell expired before Allstate approved a sale.

179. Allstate breached its duty in its repeated and false assurances to Mrs. Parson that she would be given an extension on the imposed time frame and that a sale would be approved.

180. Allstate breached its duty in its' employees non-responsiveness in a time-sensitive situation. In particular, Allstate breached its duty when its employees refused to respond to Mrs. Parson's calls and when all FSLs' that Mrs. Parson had been in contact with were out of the office or non-responsive.

181. As a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions of Defendant Allstate, newly widowed Mrs. Parson sustained severe emotional distress regarding her ability to sell the agency and financially provide for her two young children, which manifested itself in sleeplessness, headaches, nervousness and anxiety.

182. Because of Allstate's negligence, Mrs. Parson suffered emotional distress and requests damages in excess of $75,000.

The EA Agreement is an enforceable contract, and Allstate has a clear duty under the EA Agreement to refrain from interfering in negotiations for agency sales. Allstate breached the contract when it interfered with the negotiations between Mr. Rondon and Mr. Arnette by directing Mr. Arnette to purchase another, less expensive agency. Because of Allstate's material breach, Mr. Rondon suffered damages in excess of $665,000. *See* ¶¶ 15-29.

/ / /

/ / /

/ / /

/ / /

**Verified First Amended Complaint**          41

**COUNT V:**

*Plaintiff Catherine C. Hymel Against Defendant*

**Breach of Contract for**
**Allstate's Interference in the Sale of Catherine C. Hymel's Agency**

183. Ms. Hymel re-alleges and incorporates by reference the preceding paragraphs 100-131.

184. The EA Agreement is an enforceable contract, and Allstate has a clear duty under the EA Agreement to refrain from interfering in negotiations for agency sales. Allstate breached the contract when it interfered with the negotiations between Ms. Hymel and Mr. Jackel, and when it informed Mr. Levenway he would receive Ms. Hymel's book of business without purchasing Ms. Hymel's financial interest. Because of Allstate's material breach, Ms. Hymel suffered damages in excess of $272,000. *See* ¶¶ 15-29.

## Prayer for Relief

**WHEREFORE,** Plaintiffs pray for the relief set forth below:

185. Award Mrs. Parson, as Independent Administrator of the Estate of Michael Bradley Parson, an amount to be determined, for Allstate's breach of contract in its interference in the sale of Michael Bradley Parson's agency to an objectively qualified buyer;

186. Award Mr. Rondon damages, in an amount to be determined, for Allstate's breach of contract in its interference in the sale of his agencies to an objectively qualified buyer;

187. Award Mr. Rondon damages, in an amount to be determined, for Allstate's breach of contract in its arbitrary and capricious termination of Agent Verbarg's EA agreement with Allstate;

**Verified First Amended Complaint**     42

188. Award Mrs. Parson, in an amount to be determined, for Allstate's negligence in its infliction of emotional distress on Mrs. Parson;

189. Award Ms. Hymel damages, in an amount to be determined, for Allstate's breach of contract in its interference in the sale of her agency to an objectively qualified buyer;

190. Award interest, costs, and reasonable attorney fees;

191. Grant any other relief this Court deems appropriate.

Respectfully submitted,

/s/ H. Kent Heller
H. Kent Heller
*Local Counsel for Plaintiff*
HELLER, HOLMES, & ASSOCIATES, PC
1101 Broadway Ave.
Mattoon, IL 61938
Telephone: (217) 235-2700
kent@hhlawoff.com

/s/ James Bopp, Jr.
James Bopp, Jr., IN Bar No. 2838-84*
*Lead Counsel for Plaintiff*
Melena S. Siebert IN Bar No. 35061-15*
Cassandra R. Dougherty CA Bar No. 336487*
THE BOPP LAW FIRM, PC
*The National Building*
1 South Sixth Street
Terre Haute, IN 47807-3510
Telephone: (812) 232-2434
Facsimile: (812) 235-3685
jboppjr@aol.com
msiebert@bopplaw.com
cdougherty@bopplaw.com
* Motion for pro hac vice admission forthcoming

**Verified First Amended Complaint**          43

**Verification**

I, Jennifer Parson, declare as follows:

1.  I am a resident of Maryland.

2.  If called upon to testify, I would testify competently as to the matters set forth in the

    foregoing *Verified Complaint for Monetary Relief.*

3.  I verify under the penalty of perjury under the laws of the United States of America that the

    factual statements in this *Verified Complaint for Monetary Relief* concerning me and my past

    and intended activities are true and correct to the best of my knowledge and understanding.

    28 U.S.C. § 1746.

Executed on July __20__, 2022.


_Jennifer Parson_
_____
Jennifer Parson

**Verification**

I, Brandon Rondon, declare as follows:

1.  I am a resident of Oklahoma.

2.  If called upon to testify, I would testify competently as to the matters set forth in the foregoing *Verified Complaint for Monetary Relief.*

3.  I verify under the penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Monetary Relief* concerning me and my past and intended activities are true and correct to the best of my knowledge and understanding. 28 U.S.C. § 1746.

Executed on July _29_, 2022.


_Brandon Rondon_

Brandon Rondon

**Verification**

I, Catherine Hymel, declare as follows:

1. I am a resident of Louisiana.

2. If called upon to testify, I would testify competently as to the matters set forth in the foregoing *Verified First Amended Complaint for Damages.*

3. I verify under the penalty of perjury under the laws of the United States of America that the factual statements in this *Verified First Amended Complaint for Damages* concerning me and my past and intended activities are true and correct to the best of my knowledge and understanding. 28 U.S.C. § 1746.

Executed on August 3_o, 2022.


Catherine Hymel

## Certificate of Service

I hereby certify that on August 30, 2022, a copy of the foregoing and all attachments thereto was filed electronically using the Court's electronic filing system and served by email upon:

Joshua D. Lee
Riley Safer Holmes & Cancila LLP
70 W. Madison Street, Suite 2900
Chicago, Illinois 60602

/s/ Cassandra R. Dougherty
Cassandra R. Dougherty
Counsel for Plaintiff

**Verified First Amended Complaint**      44